COURT OF APPEALS
DECISION
DATED AND FILED

October 24, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2023AP1258-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF1201

IN COURT OF APPEALS
DISTRICT IV

---

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

ANTONIO DANYA WHITE,

   DEFENDANT-APPELLANT.

---

APPEAL from judgments and an order of the circuit court for Rock County: KARL HANSON, Judge. *Affirmed*.

Before Kloppenburg, P.J., Blanchard, and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   Antonio White appeals judgments of conviction for criminal charges related to a shooting incident.   The circuit court entered the

judgments after finding White guilty on four charges at a bench trial. White also appeals the circuit court order denying his motion for postconviction relief. He argues that he is entitled to a new trial because the State failed in its constitutional and statutory obligations to disclose evidence favorable to the defense, and also because trial counsel provided him with constitutionally ineffective assistance. We reject his arguments and affirm.

## BACKGROUND

¶2      The charges in this case arise from a shooting incident on Dewey Avenue in Beloit ("the Dewey Avenue shooting"). The Dewey Avenue shooting occurred on a Monday afternoon in April 2017. Witnesses told police that a Black man who wore his hair in long dreadlocks, and who was dressed in a red, hooded sweatshirt and dark pants, pulled a black handgun from a pocket and fired multiple times in the direction of a nearby vehicle. Two bullets struck a different occupied vehicle, but fortunately no one in any vehicle or otherwise on the scene was physically injured. Police recovered three .40 caliber spent casings from the street where the shots were fired.

¶3      White was charged with the following: three counts of first-degree recklessly endangering safety by use of a dangerous weapon; possession of a firearm after an adjudication of delinquency on a felony; possession of a dangerous weapon by a person under 18; and endangering safety by use of a dangerous weapon-intentionally discharging a firearm into a vehicle.

¶4      At a bench trial, the circuit court was essentially asked to decide two questions. Did the prosecution prove beyond a reasonable doubt that White fired the handgun at the Dewey Avenue shooting? If so, did the State prove beyond a

reasonable doubt that White intentionally fired into the occupied vehicle that was struck by the two bullets?

¶5      On the identity-of-the-shooter question, the prosecution relied on identifications by three eye witnesses who testified at trial, as well as other evidence discussed below.  The defense sought to raise doubts about the witness identifications and other evidence, and took the position that the prosecution fell short of meeting its burden of proof beyond a reasonable doubt.

¶6      The circuit court found White guilty on four of the five counts.  The court acquitted him on one charge of endangering safety by use of a dangerous weapon by intentionally discharging a firearm into a vehicle.  The court determined that the prosecution failed to prove that White intentionally fired into the vehicle, as opposed to doing so negligently or recklessly.  The court sentenced White to terms of imprisonment on the four counts of conviction.

¶7      In a postconviction motion filed by his new counsel, White made the following arguments as pertinent to this appeal.[1]   He contended that the prosecution violated its statutory evidence production obligations and, through the same acts or omissions, committed ***Brady*** violations.[2]  Separately, White argued

---

[1] We do not address arguments that White raised in the postconviction motion which he does not renew on appeal.

[2] *See* WIS. STAT. § 971.23(1) (2021-22) (defining categories of materials that prosecutors "must disclose" to defendants, if "within the possession, custody or control of the state," including, under subpart (h), "[a]ny exculpatory evidence"); ***Brady v. Maryland***, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

that trial counsel was constitutionally ineffective in: failing to impeach one trial witness's identification of White as the shooter in the Dewey Avenue shooting; failing to adequately use at trial evidence about a gray vehicle that White was video-recorded getting into shortly before, and four blocks from, the Dewey Avenue shooting; failing to investigate White's prior police contacts that were referenced in a search warrant used in the investigation of the Dewey Avenue shooting and failing to object at trial to references to White's prior police contacts; and failing to seek suppression of the search warrant.

¶8 The circuit court held an evidentiary hearing to address both the evidence production claims and the ineffective assistance of trial counsel claims, consistent with *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

¶9 Potential evidence that was new to both sides surfaced at the hearing. More specifically, both defense counsel and the prosecutor learned for the first time about what we will refer to as "the gun-match data." Testimony about the gun-match data was given by Joe Cassioppi, a Beloit police detective. Cassioppi testified that forensic analysis had been conducted through the National Integrated Ballistic Information Network system, which is operated by the federal Bureau of Alcohol, Tobacco, Firearms and Explosives. The analysis was of physical features of the three .40-caliber spent casings that were recovered at the scene of the Dewey Avenue shooting. Analysts compared those features to the features of .40-caliber spent casings that had been recovered from the scenes of other shooting incidents. Cassioppi testified that analysts concluded that the same firearm that was used in the Dewey Avenue shooting in April 2017 was also used in two separate shootings that occurred later in Rockford, Illinois, one in August 2017 and the other in October 2017.

¶10    The day after the evidentiary hearing, the prosecution provided to the defense additional information that was also new to both the prosecution and defense.  This consisted of Rockford police reports corresponding to the two Rockford shooting incidents, both of which remained unsolved.  Of particular note in this appeal is the police report relating to the unsolved October 2017 shooting.  This is because that report identified a witness to the shooting, who we refer to as A.B.[3]  We make no further reference to the report relating to the August 2017 shooting incident in Rockford.

¶11    The police report on the October 2017 Rockford shooting incident stated that A.B. told police that A.B. encountered the shooter immediately following the shooting and that the shooter was "a light-skinned [B]lack male, approximately 6'2"-6'3", with thin build" who was holding "a small black handgun."  Additional notations in this police report implied that A.B. further described the shooter to police as being 19-26 years old and wearing his hair in "shoulder length dreadlocks."  As discussed further below, some aspects of this description are consistent with White's physical characteristics.

¶12    The gun-match data and the October 2017 Rockford police report are relevant to the issue of whether White was the shooter in the Dewey Avenue shooting because of the following additional, undisputed fact:  White was confined in the Rock County Jail in October 2017, awaiting trial in this case.  Therefore, White could not have been the shooter in the October 2017 Rockford incident.  This raises the possible inference that the shooter in the October 2017 Rockford

---

[3] We use fictitious initials to refer to victims and witnesses to the Dewey Avenue and Rockford shootings.

incident—a person other than White, but who shared some physical features with him and who used the same gun as was used in the Dewey Avenue shooting—was the person responsible for the Dewey Avenue shooting. We will refer to all of this evidence collectively as "the third-party perpetrator evidence." The defense requested additional time to investigate the third-party perpetrator evidence, and then filed an "addendum" to the post-conviction motion, arguing that failure by the prosecution to provide the defense with the third-party perpetrator evidence in time for defense use at the bench trial violated WIS. STAT. § 971.23(1)(h) and *Brady*. The parties also continued to dispute White's ineffective assistance of trial counsel claims.

¶13    After considering submissions by the parties and oral arguments, the circuit court issued a written decision rejecting each of White's arguments for relief. White appeals.

## DISCUSSION

## I. EVIDENCE PRODUCTION

¶14    "A defendant has a due process right to any favorable evidence 'material either to guilt or to punishment' that is in the State's possession." *State v. Wayerski*, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468 (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). This includes any evidence that may impeach a witness called by the State. *Id.* (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). "A *Brady* violation has three components: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material." *Wayerski*, 385 Wis. 2d 344, ¶35 (citing *State v. Harris*, 2004 WI 64, ¶15, 272 Wis. 2d 80, 680

6

N.W.2d 737, in turn citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). "Evidence is not material under *Brady* unless the nondisclosure 'was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.'" *Wayerski*, 385 Wis. 2d 344, ¶36 (quoting *Strickler*, 527 U.S. at 281).

¶15 The prosecution in a criminal case also has a statutory duty to disclose exculpatory evidence within a reasonable time before trial. WIS. STAT. § 971.23(1)(h). As with *Brady*, the statutory requirement extends to impeachment evidence. *Harris*, 272 Wis. 2d 80, ¶¶27-30. A statutory evidence production violation occurs when the defense files a discovery demand, the case has progressed to or beyond the point at which there is sufficient time for the defense to make effective use of evidence before trial, the State suppresses the evidence which is within its custody and control, the suppressed evidence is favorable to the defense, and the evidence is material.[4] *See id.*, ¶¶35-39. The statutory materiality requirement is the equivalent of the requirement of prejudice under *Brady*; "'evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Harris*, 272 Wis. 2d 80, ¶14 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

¶16 Courts on appeal "independently review whether a due process violation has occurred, but we accept the trial court's findings of historical fact unless clearly erroneous." *Wayerski*, 385 Wis. 2d 344, ¶35.

---

[4] The States does not argue in this appeal that White failed to file a discovery demand sufficient to trigger the statutory discovery obligations.

¶17    We reject White's evidence production argument based on our conclusion that White fails to show materiality, which is required under both *Brady* and the statutory evidence production standards.  White fails to show a reasonable probability that the result of the proceeding would have been different if the third-party perpetrator evidence had been disclosed to the defense.

¶18    The State does not dispute that the third-party perpetrator evidence, if admissible at trial for the truth of the matters asserted in reports, would be exculpatory to at least some degree.

¶19    Further, we assume without deciding, in favor of White's positions on appeal, that White is correct on each of the following propositions, each of which is disputed on appeal by the parties.  First, we assume without deciding that the prosecution possessed the gun-match data in time to provide all of this information to the defense so that the defense could use it at trial and also either possessed, or had a duty to learn of and obtain, the Rockford police reports on the same timeline.  Second, we assume without deciding that all of the third-party perpetrator evidence would be admissible at trial, to be considered by the factfinder for the truth of the matters asserted (*e.g.*, that the defense could call A.B., who would testify consistently with the relevant allegations contained in the Rockford police report, and that the factfinder at White's trial could consider those allegations for their truth).[5]  Third, we assume without deciding that we should give no weight to the statements made by the circuit court in resolving the

---

[5] In light of this assumption, we need not address White's argument that we should remand for an evidentiary hearing to give him an opportunity to show that he could elicit relevant, admissible testimony at a new trial from one or more witnesses related to the October 2017 shooting incident in Rockford.

postconviction motion regarding how the court, as the trier of fact at trial, would have assessed the third-party perpetrator evidence if it had been presented at trial.

¶20 Bearing in mind those assumptions, we now provide additional background to explain our materiality conclusion, beginning with evidence presented at trial.

¶21 The prosecutor played a 57-second video recording reflecting activity that occurred nine minutes before the Dewey Avenue shooting and four blocks away from it. Police Officer Brandon Jones and Detective Patrick Mackey both testified that they were familiar with White from past contacts with him and that the video recording showed images of White, and defense counsel did not contest these identifications of White during cross-examinations of Jones and Mackey. The video shows White run up to, then run away from, several people who were then engaged in a physical fight in front of the Keeler Store in Beloit. On the video, White is wearing a red jacket with black sleeves. He runs from the fight in front of the Keeler Store and gets into a gray four-door vehicle that drives away.

¶22 Detective Mackey further testified that two other persons he could identify in the Keeler Store video, in addition to White, were Rossie Brice, who is a half-brother to White, and Eric Short, a nephew of White's.

¶23 A witness we identify as C.D. testified to the following. C.D. witnessed the Dewey Avenue shooting while he was driving to his residence with his son and daughter. The shooter was a Black male who was "tall," a "pretty big guy with long hair," who wore his hair in "braids." The shooter seemed to aim the gun at another Black male, who ran away. C.D. indicated to police at the time of the shooting that C.D. was "[a]bout 50" percent sure that an image of White's face

was the same person who fired the gun, and also that C.D. was "pretty sure" of that identification. C.D. also told police that the shooter was approximately 25-35 years old.

¶24 A witness we identify as E.F. testified to the following. E.F., along with her husband and young child, were in the car that was struck by two bullets. A car was stationary in the middle of Dewey Avenue up the block from E.F.'s car. Next to the stationary car was a group of more than five persons who all appeared to be Black and who appeared to be just hanging out. As a different car approached, a Black male wearing a "red bulkier shirt," with his hair in "longer dreadlocks," "jumped out of the group" that was up the block from E.F.'s car and started "almost running towards" E.F.'s car, moving at the pace of a "trot." The man's dreadlocks swayed as he ran. When the man was the equivalent of four or five houses down the block from E.F., he shot a gun twice in the direction of the approaching car, paused, and then fired a third round that hit the windshield of E.F.'s car, showering the car's occupants in broken glass. The shooter got into the car that was in the middle of Dewey Avenue, which departed the scene.

¶25 E.F. testified that she was "60 percent" certain that a photo of White's face contained in a photo array that police showed her after the shooting was an image of the shooter, with her degree of certainty at about that same level both at the time of the identification following the shooting and at the time of trial. The shooter and White both appeared to have the same "longer dreadlocks" and "smaller-featured face."

¶26 During E.F.'s trial testimony, the prosecutor played the Keeler Store video. E.F. testified that the person who Officer Jones identified as White from the video appeared to E.F. to be "very, very similar" to the Dewey Avenue shooter

who trotted toward her car, including wearing a similar "bulkier" red jacket, having a similar hair style, and moving in a similar manner. Regarding the person identified as White in the video, his manner of running in the video, his "movements and the hair," were "definitely pretty much spot on the way I remember … the gentleman coming forward to us during the shooting" on Dewey Avenue.

¶27    In addition, E.F. testified that a Black male who was a larger person than White, who can be seen in the Keeler Store video, resembles a person who was with the group at the scene of the Dewey Avenue shooting from which the shooter emerged. E.F. also testified that White was the only person shown in the Keeler Store video who wore hair styled in dreadlocks.

¶28    A witness we identify as G.H. testified to the following. He was sitting in a car with his wife, E.F., when a man who had been in a group of people in front of them "jumped out from the group," ran toward G.H., "pulled out a gun," and fired three shots, the last of which hit the windshield of G.H.'s car and almost hit G.H. When the shooter fired the gun, he was approximately 30-40 feet from the car G.H. and E.F. were in. The shooter was a Black man with a "skinnier … head," and dreadlocks "down to about shoulder length, maybe longer," with an "average build." He wore a sweat-shirt-like red shirt and blue jeans. G.H. testified that he was "60 percent" certain that a photo of White's face in a photo array that police showed him after the shooting was an image of the shooter. This was based on characteristics of White's hair and the shape of his head, which was "more elongated."

¶29    As he had done when examining E.F., the prosecutor played for G.H. the Keeler Store video. G.H. testified that, "based off of the clothing, the

dreadlocks, and physical characteristics that I recall," the person who Officer Jones identified as White in the video "does seem to be the person that I recall doing the shooting" on Dewey Avenue. "The way the person in the Keeler Store video was running accurately depicts how I remember the person running" on Dewey Avenue before shooting. G.H. also testified that, while the person identified as White in the Keeler Store video wore a red top with "dark, full length sleeves," in the stress of the moment of the shooting G.H. could have processed the sleeves as red, three-quarter-length. Further, like E.F., G.H. testified that he believed that a Black male who had a larger frame than White and who can be seen in the Keeler Store video was with the group at the scene of the Dewey Avenue shooting from which the shooter emerged.

¶30 There was also evidence that, two days after the Dewey Avenue shooting, police executed a search warrant at White's residence, which was located two blocks from the shooting. In a bedroom, police found a plastic bag containing 22 unfired Smith & Wesson Winchester .40-caliber cartridges, which is precisely the type of cartridges used by the shooter in the Dewey Avenue shooting. A state crime laboratory analyst testified that, of the 15 or 16 fingerprints developed from the plastic bag containing the cartridges that were suitable for comparison, 13 belonged to White.

¶31 White called as a witness his brother, Johnny Brice, who testified to the following. Brice lived with his mother in the residence that police searched, specifically residing in the bedroom where the plastic bag containing unfired cartridges was found by police. White was not living in the residence at the time of the Dewey Avenue shooting. Brice had obtained and owned the unfired cartridges for a long time, although he did not own a .40-caliber firearm.

¶32    Bearing in mind the nature of the trial evidence, we now explain why we conclude that White fails to show a reasonable probability that, had the State timely disclosed the third-party perpetrator evidence, the result of the proceeding would have been different.

¶33    Particularly strong evidence was presented in the testimony of both E.F. and G.H. that, to a high degree of certainty, the person who is seen running in the Keeler Store video—who the defense did not dispute was White—was the same person they saw run in a distinctive manner and then fire the shots on Dewey Avenue.  Both E.F. and G.H. testified to multiple matching aspects of the appearance, dress, and gait of the Dewey Avenue shooter and White as shown in the Keeler Store video just before, and only blocks from, the Dewey Avenue shooting.  Further, both E.F. and G.H. testified that another person who is seen in the Keeler Store video resembled someone also present at that fight, adding to the proof of a direct nexus between the Keeler Store activity in which White participated and the Dewey Avenue shooting.[6]

¶34    It is true that the identifications of White's photographed face made by C.D., E.F., and G.H., standing alone, were not individually or cumulatively robust proof of White's guilt.  But in contrast, a factfinder at a new trial would be reasonably expected to place considerable weight on the testimony of E.F. and G.H. about the Keeler Store video images of White matching the Dewey Avenue

---

[6] White makes a passing suggestion that the circuit court could not rely on the identification testimony by E.F. and G.H. because showing these witnesses the Keeler Store video "was akin to a 'showup' procedure [in which police] present[] [the image of] a suspect singly to a witness for identification."  But White's argument along these lines is undeveloped in multiple respects, including failures to cite on-point legal authority and to show that White raised this issue in the circuit court, and we reject this as an argument based on the lack of development.

shooter's appearance and movements. Added to this was the evidence linking White to at least one other person who witnesses placed at the scenes of both the Keeler Store incident and the Dewey Avenue shooting, as well as the evidence linking White to the Smith & Wesson Winchester .40-caliber cartridges of precisely the same type as those used in the Dewey Avenue shooting. All of this evidence together created a solid basis to find White guilty.

¶35    Turning to the third-party perpetrator evidence, to recap, we assume that, at a new trial, the defense would be able to elicit testimony from A.B. that the shooter in the October 2017 shooting incident in Rockford, who used the same gun as was used in the Dewey Avenue shooting, was a light-skinned Black male, approximately 6'2"-6'3", with a thin build, who was 19-26 years old and wore his hair in "shoulder length dreadlocks." The factfinder at a new trial would also be informed that the Rockford shooter could not be White (although perhaps to avoid unduly prejudicing White, a jury as trier of the facts would not learn the detail that this was because he was in jail at the time on the charges in this case).

¶36    White now, we think reasonably, uses the following shorthand to characterize A.B.'s reported description of the Rockford shooter: "a tall, thin, young [B]lack male with shoulder-length dreadlocks." The State does not dispute that the Dewey Avenue shooting was perpetrated by someone who also fits that general description. But that general description would also have fit many other people. We are left with only a weak inference that, if one discounted all of the strong evidence of White's guilt that we have summarized above, the Rockford shooter (who could not have been White) and the Dewey Avenue shooter could have been the same person. Given the strong evidence of White's guilt that we have summarized above, we conclude that if the factfinder had been given the

additional hypothetical testimony from A.B. there is not a reasonable probability that the result of the proceeding would have been different.

¶37 In sum on this issue, this is not a situation in which the evidence favorable to the defense "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *See Kyles v. Whitley*, 514 U.S. 419, 435 (1995). White relies heavily on this U.S. Supreme Court opinion, but that was a case in which, unlike here, the evidence that was not disclosed "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *See id.* at 441.

## II. INEFFECTIVE ASSISTANCE

¶38 The Sixth and Fourteenth Amendments to the United States Constitution guarantee criminal defendants the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *see also* WIS. CONST., art. I, § 7. The factual circumstances of the case, counsel's conduct, and counsel's strategy generally constitute facts to be determined by the circuit court, which will not be overturned unless clearly erroneous. *See State v. Thiel*, 2003 WI 111, ¶21, 264 Wis. 2d 571, 665 N.W.2d 305. "Whether counsel's performance satisfies the constitutional standard for ineffective assistance of counsel is a question of law, which we review de novo." *Id.* "To demonstrate that counsel's assistance was ineffective, the defendant must establish that counsel's performance was deficient and that the deficient performance was prejudicial." *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93. "If the defendant fails to satisfy either prong, we need not consider the other." *Id.*

¶39 Whether trial counsel performed deficiently is an issue of law that we review de novo. *Id.*, ¶38. To establish that counsel's performance was

15

deficient, the defendant must show that it fell below "an objective standard of reasonableness." *Thiel*, 264 Wis. 2d 571, ¶19. Whether deficient performance was prejudicial is also an issue of law that we review de novo. *State v. Domke*, 2011 WI 95, ¶33, 337 Wis. 2d 268, 805 N.W.2d 364. To establish that deficient performance was prejudicial, the defendant must show that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, ¶54 (quoting *Strickland*, 466 U.S. at 694).

### A. E.F.'s Facial Identification

¶40 White argues that it was ineffective for trial counsel to fail to attempt to impeach E.F.'s testimony that she was "60 percent" certain that a photo of White's face contained in a photo array that police showed her after the shooting was an image of the shooter. White contends that counsel should have impeached E.F. with the video recording of E.F.'s viewing of a photo array, which would have undermined her identification of his face. We assume without deciding that it was deficient performance not to impeach E.F.'s identification of White by his face with the video. Operating from this assumption, we conclude that there is not a reasonable probability that the result would have been different if E.F. had been impeached in this manner.

¶41 At the postconviction hearing trial counsel did not dispute, nor does the State now dispute, White's position that defense counsel could have used the following aspects of the video to raise significant issues about the reliability of E.F.'s facial identification testimony. E.F. took a lengthy pause after being shown White's photo and said only that it was "possible" that he was the Dewey Avenue

16

shooter, indicating that her certainty that it was the same person was 60 percent. When shown a photo of another person, E.F. took a longer pause and said, "I can't be for certain," and said that the second person "looks very similar" to the Dewey Avenue shooter, but also said that she could not be certain either way. She added that the photo of White and the person in the next photo she looked at "both look very … it could be either or." When shown yet another photo, she took another pause and said, "Now, I might almost change the one I did write on [White's photo], because they're almost identical to me." She later said, "It's so hard," and "They're very similar."

¶42    These aspects of the video could readily support a finding that E.F.'s recall of the Dewey Avenue shooter by his face was not reliable. But E.F. assessed her certainty of facial identification as being 60 percent, which the circuit court would have reasonably interpreted to mean only that she thought it was slightly more likely than not that White had the face of the shooter. Further, as we have noted, her much more incriminating testimony was that the appearance, dress, and gait of the Dewey Avenue shooter matched White in the Keeler Store video. In sum on this issue, essentially excising from the evidence E.F.'s facial identification does not change the evidence of guilt in a meaningful way. Accordingly, we reject this ineffective assistance argument based on White's failure to show prejudice.

### B.  Vehicle Identification

¶43    We resolve the second ineffective assistance issue on the same ground of a lack of showing prejudice. White argues that trial counsel did not sufficiently probe witnesses regarding the vehicle-identification aspects of the following facts:  in the Keeler Store video, White is seen getting into a gray sedan,

but witnesses to the Dewey Avenue shooting consistently described the people standing at the scene as being next to two cars that were red. The exception was one witness (G.H.), who described a gray sedan being at the Dewey Avenue scene, but G.H. admitted that his memory on this point changed after he watched the Keeler Store video. The premise of White's argument is that, if the gray sedan that appears in the Keeler Store video was not identified by witnesses at the scene of the Dewey Avenue shooting, then White was less likely to have been the shooter. This is because, according to White, if he or an associate of his travelled to the Dewey Avenue shooting scene in that gray sedan, then that vehicle, not a red one, would have remained on the scene after White got out of it. Assuming without deciding that it was deficient performance for counsel to fail to pursue the vehicle-identification issue more than counsel did, White fails to show that he was prejudiced by counsel's performance.

¶44 There are simply too many layers of speculation to White's argument to support a determination of prejudice, particularly in light of the strong identification evidence that we summarize above. White fails to establish that, even if defense counsel had devoted maximum effort into the vehicle-identification issue, there was sufficient available evidence to present a strong case for all of the following series of possibilities: in order for White to have appeared at the scene of the Dewey Avenue shooting, he necessarily got there by way of the gray sedan, as opposed to by way of any number of other possible means, because that is the particular vehicle he entered at the Keeler Store scene; if White did reach the scene of the Dewey Avenue shooting by way of the gray sedan, then the gray sedan would necessarily have remained both on the scene and potentially visible to witnesses at the time of the shooting; if the gray sedan was in fact in the area and potentially visible, then witnesses to this traumatic incident would have

18

had good reason to pay sufficient attention to recall the appearances of vehicles and to specifically recall that the gray sedan was in the area. Beyond those points, at a retrial, G.H. would presumably testify again that the gray sedan was in fact on the scene, and a factfinder might credit that testimony even if there is a basis to impeach it.

### C. Evidence of White's Character

¶45 White asserts that defense counsel was ineffective in allegedly failing to investigate references made at trial to White having prior police contacts that allegedly related to violent crimes and in failing to object to those references. These arguments are not well developed or supported. It is sufficient to reject these arguments to note the following. The circuit court explained in its ruling on the postconviction motion that the court did not rely on these references to reach impermissible conclusions. When the court is the trier of fact, the court is presumed to properly discern and weigh improper inferences and to disregard extraneous matters. *See* *State v. Cathey*, 32 Wis. 2d 79, 90, 145 N.W.2d 100 (1966). White fails to develop a supported argument for either deficient performance or prejudice.

### D. Search Warrant

¶46 White argues that trial counsel was ineffective in failing to move to suppress the evidence obtained in the search of White's residence under authority of a search warrant. More specifically, White contends that counsel should have requested a *Franks-Mann* hearing, at which he argues he would have established that there were false allegations and material omissions in the search warrant affidavit supporting the warrant. *See* *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *State v. Mann*, 123 Wis. 2d 375, 367 N.W.2d 209 (1985). At a *Franks-*

19

*Mann* hearing, if White could show, by a preponderance of the evidence, that police deliberately or recklessly included false information in, or omitted material information from, the warrant affidavit, then the circuit court would have been required to strike any false information from, or add any omitted information to, the affidavit and to assess probable cause based on the information that remained. *See Franks*, 438 U.S. at 156; *Mann*, 123 Wis. 2d at 388-89. We conclude that White fails to prove deficient performance because he fails to show that if counsel had brought a *Franks-Mann* motion it would have been successful. *See State v. Maloney*, 2005 WI 74, ¶37, 281 Wis. 2d 595, 698 N.W.2d 583 (failing to bring suppression motion that would have been denied does not constitute deficient performance).

¶47    Courts defer to a warrant-issuing judge's determination of probable cause "'unless the defendant establishes that the facts are clearly insufficient to support a probable cause finding.'" *State v. Green*, 2022 WI 41, ¶2, 402 Wis. 2d 44, 975 N.W.2d 198 (quoted source omitted). "Probable cause exists where, after examining all the facts and inferences drawn from the affidavits, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). A warrant-issuing judge evaluating an affidavit for probable cause is permitted to draw reasonable inferences; the test is "'whether the inference drawn is *a* reasonable one'" and "'not whether the inference drawn is the *only* reasonable inference.'" *State v. Gralinski*, 2007 WI App 233, ¶25, 306 Wis. 2d 101, 743 N.W.2d 448 (quoting *State v. Ward*, 2000 WI 3, ¶30, 231 Wis. 2d 723, 604 N.W.2d 517) (emphasis added in *Gralinski*).

¶48    In the State's response to White's postconviction motion on this issue, the State invited the circuit court to disregard various allegations in the

affidavit that White challenged in his motion. The court accepted these concessions for purposes of resolving this issue. The court concisely summarized as follows what remains in the affidavit averments that could support a finding of probable cause that a search of the residence would reveal evidence related to the Dewey Avenue shooting:

- G.H. saw "a Black man with shoulder-length dreadlocks shoot a handgun three times and one of those shots struck his car."

- White lived at the address of the residence to be searched and his mother had recently confirmed to police that he lived there.

- "White wears his hair in shoulder-length dreadlocks."

- G.H. "identified White, from a photo array, as the shooter."

Implied in this summary by the circuit court, and not disputed by White on appeal, was a time line between the shooting and the submission of the affidavit that was sufficiently tight for probable cause purposes.

¶49 We conclude that White fails to show deficient performance of his trial counsel by failing to establish either that: these averments in the affidavit summarized by the circuit court were clearly insufficient to support a determination that there was a fair probability that contraband or evidence of the crime would be found at White's residence; or any of these averments should not count as viable allegations under *Franks-Mann*. We now address White's pertinent argument to the contrary.

¶50 It is undisputed that G.H. assessed his level of certainty at 60 percent, something more certain than a 50-50 chance but something less than complete certainty or nearly so.

21

¶51    In addition, White asserts in his appellate briefing, without the benefit of a citation to the record, that G.H. qualified his identification of White through the photo array by saying that White "could be" the Dewey Avenue shooter. This is apparently based on the affirmative response of trial counsel at the *Machner* hearing to the following question: "And [G.H.] in his video statement only said that the suspect from Antonio's photo, quote, 'Could be the shooter'?" We note that this "could be" concept does not signify anything not already evident from the 60-percent qualifier. When a witness explicitly identifies a person as a perpetrator to a degree of certainty less than 100 percent, the witness is saying that the person "could be" the perpetrator and not that the person "is" the perpetrator.

¶52    Based on the 60-percent qualifier and the "could be" concept, White contends that trial counsel should have argued that the affidavit's averment that G.H. "identified Antonio White from the array as the person who fired the gun" was a deliberately false statement or one that was made in reckless disregard of the truth, and on that basis argued that the court was required to disregard the averment in considering whether the affidavit states probable cause.

¶53    But the averment was not that G.H. was 100 percent certain or nearly so. The averment conveyed only that G.H. had made a positive identification. This was true. The issuing judge would not reasonably have interpreted this to mean that G.H. had necessarily told police that the photo array identification was conclusive or free of doubt. A judge applying common sense would assume that, in the absence of a qualifier emphasizing certainty, this was an ordinary identification made to a degree of certainty greater than 50-50. Put differently, given that G.H. identified White at a greater-than-50-percent level, the degree to which G.H. expressed certainty is not a fact that "[a]ny reasonable

22

person would have known … was the kind of thing [that] the judge would wish to know" in order to determine whether there was probable cause to issue the warrant. *See **United States v. Jacobs***, 986 F.2d 1231, 1235 (8th Cir. 1993); *see also **State v. Manuel***, 213 Wis. 2d 308, 315, 570 N.W.2d 601 (Ct. App. 1997) (to support ***Franks-Mann*** argument, what is omitted from the affidavit must be "'critical material,'" such that "'inclusion is necessary for an impartial judge to fairly determine probable cause'" (quoting ***Mann***, 123 Wis. 2d at 385-86)). It would be different if G.H. had expressed concrete doubt, or had placed his certainty at less than 50 percent.

¶54 On a related note, we agree with a point that the circuit court made in its decision on the postconviction motion, namely, that the result would be the same if one were to supplement the affidavit by adding the 60-percent qualifier to the averment about G.H.'s identification. *See **Jacobs***, 986 F.2d at 1234; ***Mann***, 123 Wis. 2d at 388-89. That is, there would have been probable cause even if the averments in the affidavit that the court determined were sufficient included the added information that G.H. assessed his certainty to be 60 percent.

## CONCLUSION

¶55 For all these reasons, we affirm the judgments of conviction and the order denying the motion for postconviction relief.

*By the Court*.—Judgments and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.